# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD BOANDL,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 09-4799** |
| | : | |
| **TIMOTHY F. GEITHNER,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                         **November  1 ,  2010**

Plaintiff Richard Boandl, a former IRS agent, claims he was the victim of employment discrimination based on his disability, age, and gender while an employee of the Treasury Department.  Defendant Timothy Geithner, Secretary of the Treasury, has filed a motion for partial summary judgment.  For the reasons set forth below, I will grant the motion in part and deny it in part.

## I.    FACTS

Richard Boandl was born on October 21, 1948 and began working for the Internal Revenue Service ("IRS"), an arm of the United States Department of the Treasury, in 1973.  Because he was infected with polio at a young age, Richard Boandl has been disabled for most of his life.  Boandl Affidavit, Ex. 39 to Pl.'s Mem. In Opp'n to Def.'s Mot. To Dismiss, 1.  He has a severe limp, he cannot stand for more than a few minutes at a time, and he requires a cane to walk short distances and a wheelchair to travel distances more than twenty yards.  Id. at 1-2; Report of Dr. Norman Stempler, Pl.'s Ex. 16.  From 1983 until October 1, 2004, Mr. Boandl was employed by the IRS as an Internal Revenue Agent.  Def.'s Statement of Material Facts ("SMF")

¶ 4.[1]  At all relevant times, Mr. Boandl was assigned to the IRS's Small Business/Self-Employed

Business Operating Division in Compliance Area 3, located in Bethlehem, Pennsylvania.  Id. at ¶

5.

### A.    Mr. Boandl's Applications for Promotion

In March of 2003, Mr. Boandl applied for a promotion to a vacant position as a Revenue

Agent.  Id. at ¶ 6.  Eleven individuals applied for the position, and the selecting official, Duane

Briggs, convened a three member ranking panel to evaluate the applications.  Id. at ¶¶ 7, 8.  A

fifty-two year-old man, a fifty-five year-old man, and a forty year-old woman sat on the ranking

panel.[2]  A Human Resources Specialist (who was not a member of the panel) provided the panel

members with ranking procedures and established a cut-off score for "best qualified" applicants

of 48.20.  Id. at ¶ 11.  When the ranking panel applied the ranking procedures to the eleven

applicants, five of the eleven achieved scores earning them "best qualified" status.  Id. at ¶ 12.

Mr. Boandl was not one of those five applicants, because his score was 38.  Id. at ¶ 13.  Of the

five "best qualified" candidates, four were men and one was a woman; they were between forty-

two and fifty years-old; and none was disabled.  Id. ¶ 14 – 16.  The individual Mr. Briggs chose

for the position was a forty-nine year old female.  Id. ¶ 17.

In May of 2003, Mr. Boandl applied to another vacant Revenue Agent position.  Id. at ¶

18.  The same general procedure that had taken place to fill the first vacancy was utilized again.

---

[1]  All material facts cited by the defendant with which Mr. Boandl is in agreement, according to his response to defendant's statement, will be cited where relevant.  Any statement of fact with which Mr. Boandl does not agree, and the source of the disagreement, will be noted.

[2]  These are the panel members' ages assuming the Panel made its ranking decisions between March and April of 2003.

Duane Briggs was again the selecting official, but the three-member ranking panel was made up

of different individuals: a fifty-three year old man, a forty-one year old woman, and Diane

Heasley, who became one of Mr. Boandl's supervisors and who was forty at the time. Id. at ¶ 22.

The cut-off score for best qualified applicants for this position was 48.67,[3] and of the nineteen

applicants who were ranked, four received a score above the cut off and earned "best qualified"

status. Id. at ¶ 24. Three were men and one was a woman, their ages ranged from thirty-eight to

fifty-five years old, and none was disabled. Id. at ¶¶ 26, 27. Mr. Boandl was not one of them, as

he scored a 38.28. Id. at 25. Mr. Briggs chose a thirty-eight year old woman for the position. Id.

at ¶ 28.

Each applicant's ranking score for the positions was computed by adding two numbers:

the total score from the applicant's last performance appraisal and a score for potential that each

panel member awarded him or her. See id. at ¶¶ 29-30. Mr. Boandl's performance appraisal

score was therefore based on a review conducted in 2002, the year before he applied for the

vacant positions and before Ms. Heasley became his supervisor. Id. at ¶ 30.[4] Because the

performance appraisal score was based solely on Mr. Boandl's *past* evaluation, it was, for

---

[3] Mr. Boandl claims the cut-off score was 48.76. See Pl.'s Resp. To Def.'s SMF. The difference is immaterial to his claim.

[4] In denying this assertion and the remainder of the government's assertions concerning the ranking process, Mr. Boandl states that "the Rehabilitation Act required as a matter of law that for an individual with severe disabilities, the IRS was mandated to provide Boandl with special affirmative action. The method of computation was not in conformity with the statutory requirement." Pl.'s Resp. To Def.'s SMF, ¶ 30. He contends repeatedly that the ranking process ignored the mandates of the Rehabilitation Act. Id. at ¶¶ 32-33. In other words, Mr. Boandl denies *not* that this *was* the method the Ranking Panel used to choose individuals for the vacant positions, but rather claims that this method violated the Rehabilitation Act. This argument is noted but, because Mr. Boandl does not argue or present evidence showing that the defendant's description of the process is inaccurate, I accept the defendant's statements on this subject.

purposes of the application ranking process, an objective score. The score awarded to each applicant for potential was, on the other hand, subjective. Id. at ¶ 33. Mr. Boandl's performance appraisal score for each position was 22.80, and the highest possible score he could have received for potential was 20. Id. at ¶ 32. Therefore, the highest score he *could* have achieved for either position was a 42.80, which fell below the "best qualified" cut-off scores of 48.20 and 48.67 for the vacancies. Id. at ¶ 33.

On August 27, 2003, Mr. Boandl filed an Equal Employment Opportunity (EEO) complaint with the Treasury Department challenging his non-selection for both positions. Id. at ¶ 35.

**B.    Mr. Boandl's Request for a Cell Phone**

Ms. Heasley became Mr. Boandl's supervisor in June 2003, and some time later in 2003, Mr. Boandl approached her to request a government-issued cell phone as a reasonable accommodation for his disability. Def.'s SMF ¶¶ 34, 36, 43; Pl's Resp. To Def.'s SMF, ¶ 36. The defendant claims Mr. Boandl did not make a cell phone request until December 11, 2003, while Mr. Boandl claims he did so earlier, in a verbal request made to Ms. Heasley on or about October 23, 2003. Def.'s SMF ¶ 36; Boandl Affidavit, 7. Because I am required to view the facts presented in the light most favorable to Mr. Boandl, I will assume that Mr. Boandl first made his request in October, 2003.

Mr. Boandl claimed he needed the cell phone to assist in his investigative duties, which required traveling outside his office to locate tax non-filers and visit witnesses. He averred that he told Ms. Heasley that "disability related barriers caused [him] much difficulty, such as, getting in and out of [his] car, walking, and standing; then, repeating the process until [he] was able to

find a working pay phone." Boandl Affidavit, 7. According to Mr. Boandl, Ms. Heasley immediately denied his request. Id. Mr. Boandl then contacted an EEO Counselor who instructed him to email the cell phone request to Ms. Heasley. Pl.'s Resp. To Def.'s SMF, ¶ 41. Mr. Boandl did so, and claims that the December 11, 2003 email he sent to Ms. Heasley was therefore a second request. Id. Ms. Heasley provided Mr. Boandl a memorandum officially denying his request for a cell phone on January 20, 2004. Boandl Affidavit, 8; Def.'s SMF ¶ 41. On February 19, 2004, Mr. Boandl filed a second EEO complaint based on Ms. Heasley's refusal to issue him a cell phone. Id. at ¶ 51.

### C. Negative Performance Evaluations and TIGTA Referral

Mr. Boandl claims that a period of "unrelenting retaliation and harassment," primarily from Ms. Heasley, began about a month after he filed his first EEO complaint in August of 2003. Boandl Affidavit, 5. On September 24, 2003, Ms. Heasley issued a negative performance evaluation of Mr. Boandl's work. Id. On January 26, 2004, she noted in another review that Mr. Boandl sent a taxpayer a complimentary letter in violation of IRS procedures. Def.'s SMF ¶ 44. Mr. Boandl does not deny receiving the letter, but claims that sending the letter did not violate IRS policy. Pl.'s Resp. To Def.'s SMF, ¶ 44. The letter was sent to two married taxpayers. Letter, Boandl Ex. 7. It is a one page, typed letter on Department of the Treasury, Internal Revenue Service letterhead and consists of five sentences regarding the work done for the taxpayers by their representative, including one stating that, "[d]uring my 30 years as a Revenue Agent, I have had contacts with literally hundreds of professional corporate, and government employees on all levels and none have shown more ability than [your tax preparer]." Id. The signatory is "Richard Boandl, Revenue Agent." Id. An IRS regulation in place at the time Mr.

Boandl sent the letter provides that "[a]ll one time use letters must be approved by the group manager, prior to mailing."  Internal Revenue Manual Section 4.10.2, Boandl Ex. 6.  Mr. Boandl does not claim he sought management approval for the letter.  Both Ms. Heasley and Mr. Briggs testified at an EEOC hearing that it was against IRS policy for a Revenue Agent to recommend or suggest the services of a particular tax practitioner.  EEO Decision, Def. Ex. 1.

On February 3, 2004, Ms. Heasley informed Mr. Boandl during a meeting that his overall performance was unacceptable and specifically cited the complimentary taxpayer letter.  Def.'s SMF ¶ 45.  On February 10, 2004, Ms. Heasley and Mr. Boandl's "second line" supervisor, Mr. Briggs, referred the taxpayer letter to the Treasury Inspector General for Tax Administration (TIGTA) for investigation.  While the defendant claims Mr. Boandl's issuance of a complimentary letter to a taxpayer violated IRS policy, Mr. Boandl disagrees, arguing that the IRS policy against sending letters to taxpayers applied only to initial contacts.  Def.'s SMF ¶ 48; Pl.'s Resp. To Def.'s SMF ¶ 44.

Ms. Heasley issued Mr. Boandl an opportunity to improve letter on March 25, 2004. Def.'s SMF ¶ 52.  In the letter, she informed him that he was failing to perform at an acceptable level, that he had 120 days to improve his performance, that his work would be subject to periodic review during the 120 day improvement period, and that he faced termination if he did not improve.  Id.  Ms. Heasley provided reasons for this negative evaluation, including Mr. Boandl's failure to complete work assignments on time, failure to spend the appropriate amount of time on assignments, issuance of taxpayer summonses without prior authorization, issuance of third-party letters, visits to taxpayer homes, and failure properly to document audit trails.  Id. at ¶ 53.  Mr. Boandl confirms that these were the reasons provided in the letter, but denies that these

-6-

reasons were valid. Pl.'s Resp. To Def.'s SMF ¶ 53. In a memorandum dated March 25, 2004, Mr. Boandl was also informed that, because of his negative performance evaluation, he was no longer permitted to take part in the IRS' Flexiplace program, which had allowed him to perform certain work from home. Def. SMF ¶ 56. Prior to Ms. Heasley becoming his supervisor, Mr. Boandl had received generally satisfactory reviews of his work. Pl.'s SMF ¶ 22. For example, Mr. Boandl's performance was evaluated in May of 2002 by Kathleen Navarre. Her evaluation shows that on a scale from 1 to 5, Mr. Boandl scored either a 3 or a 4 on each of five essential job elements. Performance Evaluation, Boandl Ex. 20. The "summary level" for his job performance was "exceeds fully successful." Id.[5]

On March 26, 2004, Mr. Boandl requested leave to amend his second EEO complaint (based initially on Ms. Heasley's refusal to issue him a cell phone) to include discrimination and retaliation claims based on his negative performance evaluation. Def.'s SMF ¶ 57. His request was approved. Id.

On August 13, 2004, TIGTA completed a report concerning Mr. Boandl's issuance of the complimentary taxpayer letter, in which it concluded that Mr. Boandl had issued the letter but that he had not done so for financial gain. Id. at ¶¶ 62, 63. The TIGTA report also revealed that, in contravention of IRS rules, Mr. Boandl had issued taxpayer summonses without first receiving management approval. Id. ¶ 64. Mr. Boandl filed a third complaint of discrimination with the EEOC on November 11, 2004, concerning the TIGTA referral. Id. at ¶ 71.

---

[5] The "summary level" ratings ranged from lowest to highest as follows: unacceptable; minimally successful, fully successful, exceeds fully successful, outstanding.

## D. Boandl's Retirement from IRS and Post-Retirement Claims

On July 8, 2004, Mr. Boandl went on sick leave from his position with IRS. Id. at ¶ 58. On July 12, 2004, while Mr. Boandl was still on leave, Ms. Heasley issued another negative performance evaluation for him, rating his work as unacceptable. Id. at ¶ 59. On July 13, 2004, Mr. Boandl submitted a written memorandum to his supervisors stating that he planned to retire. Id. at ¶ 60. He formally applied for retirement on July 26, 2004. Id. at ¶ 61. On August 30, 2004 (after issuance of the TIGTA investigative report), Mr. Boandl informed the IRS that he would retire effective October 1, 2004. Id. at ¶ 68. He claims that, during the period when he was under Ms. Heasley's supervision, he suffered "negative feelings, such as[] anxiety, depression, sleeplessness, guilt, sadness, dejection, and worthlessness" and that he was "unable to experience pleasure or enjoyment." Boandl Affidavit, 6.

On September 30, 2007, almost three years after his retirement from IRS became effective, Mr. Boandl applied to the Treasury Department's Office of Professional Responsibility ("OPR") for "Enrolled Agent status," which would allow him to represent taxpayers before the IRS. Def.'s SMF ¶ 72. OPR was authorized to grant enrolled agent status to any person who qualified for such enrollment based on past service and experience with the IRS "and who had not engaged in conduct that would justify censure, suspension, or disbarment." Id. at ¶ 73. On October 16, 2007, OPR's director, Michael Chesman, wrote to the Territory Manager of the Planning and Special Program concerning Mr. Boandl's application. Id. at ¶ 74. It was standard practice for OPR to request a recommendation from an IRS executive familiar with the work of a former IRS employee. Id. at ¶ 75. The Territory Manager of the Planning and Special Program sent information from Mr. Boandl's file to Charles Brantley, the Director of the Heavy

Manufacturing and Transportation Department. <u>Id.</u> at ¶ 76; Pl.'s Resp. To Def.'s SMF ¶ 76. The information sent to Mr. Brantley regarding Mr. Boandl indicated that Mr. Boandl had a 30-day suspension from employment with the IRS in 2001 for misusing his position and collecting money from a taxpayer. Def.'s SMF ¶ 76; Pl.'s Resp. To Def's SMF ¶ 76. Based on this information, Mr. Brantley informed OPR that he did not believe Mr. Boandl was qualified for enrolled agent status, citing the 2001 suspension. Def.'s SMF ¶ 77. It is Mr. Boandl's position that this information was false. Pl.'s Resp. To Def. SMF, ¶¶ 76, 77. He claims he never received a 30 day suspension and that he never resigned from his position with the IRS because he was instead forced into retirement. <u>Id.</u>

OPR Director Michael Chesman wrote to Mr. Boandl on February1, 2008, informing him that, based on the information he had received from Mr. Brantley, he was considering denying Mr. Boandl's application for enrolled agent status. Def.'s SMF ¶¶ 78-79. In the letter, Mr. Chesman stated that Mr. Boandl's application was not being denied and that OPR was requesting additional information so that it could reach an informed decision. <u>Id.</u> at ¶ 79. On March 12, 2008, Mr. Boandl provided the supplemental information requested by Mr. Chesman. <u>Id.</u> at ¶ 80. Based on that supplemental information, OPR approved Mr. Boandl's application and granted him a certificate of enrollment effective April 17, 2004. <u>Id.</u> at ¶ 81.

Mr. Boandl filed a fourth complaint of discrimination with the EEOC on May 23, 2008, concerning the information sent to OPR from Mr. Brantley about his application. <u>Id.</u> at ¶ 82.

### E. Mr. Boandl's Complaint

Mr. Boandl filed a three count complaint in this court on October 19, 2009. In Count I of his complaint, Mr. Boandl alleges the Treasury Department violated the Rehabilitation Act,

codified at 29 U.S.C. §§ 706 *et seq*, when it denied his applications for promotion, denied his request for a cell phone as an accommodation, denied him proper evaluations, and retaliated against him by subjecting him to pretextual evaluations and discipline following the filing of his first EEO complaint. Compl. ¶ 27. He claims the Rehabilitation Act entitles him to special affirmative action as a disabled employee. Id. at ¶ 27(e). In Count I, he also alleges he was victim to a hostile work environment and that he was constructively discharged from his position with the IRS. In Count II of his complaint, Mr. Boandl alleges the Treasury Department violated the Age Discrimination in Employment Act when it used a "flawed evaluation process for promotion" that included a ranking on the basis of potential. Compl. ¶ 52. He claims the evaluation and ranking process used in the selection process for the promotions for which Mr. Boandl applied ignored Mr. Boandl's "greater credentials and professional skills." Id. at ¶ 53. He makes the same retaliation, hostile work environment, and constructive discharge claims in this count. In Count III of his complaint, Mr. Boandl alleges the Treasury Department violated Title VII. In support of this claim, Mr. Boandl again cites his rejections for promotion, arguing that females with less experience were chosen. Id. at ¶ 59. He makes the same retaliation, hostile work environment, and constructive discharge complaints in this count.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing "based on the affidavits or by depositions and admissions on file" that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir.1992).

Celotex sets forth the basic presumption that summary judgment is only appropriate "after adequate time for discovery."  477 U.S. at 322.  Indeed, on summary judgment, the nonmoving party is relieved of its burden to set forth facts showing there is a genuine issue for trial when it "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition[.]"  FED. R. CIV. P. 56(f);[6] see also Anderson, 477 U.S. at 250 n.5 ("[The]

_____

[6]  Effective December 31, 2010, the provisions in Rule 56(f) will be carried forward, without substantial change, to Rule 56(d).  See Notes to 2010 Amendments to Federal Rules of Civil Procedure.

requirement [that a nonmoving party set forth material facts] in turn is qualified by Rule 56(f)'s provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.").  An inability to access facts material to one's case will naturally be remedied by providing the nonmoving party additional time to conduct discovery.  Rule 56(f) recognizes this, and "provides for the more just adjudication of disputes by ensuring that parties are not 'railroaded' by a premature motion for summary judgment.'"  Croker v. Applica Consumer Prods., Inc., No. Civ. 05-3054, 2006 WL 626425 at *3 (D.N.J. Mar. 10, 2006) (citing Celotex, 477 U.S. at 326).  Whether a court should grant a Rule 56(f) motion and defer ruling on a summary judgment motion "depends, in part, on what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained."  Contractors Ass'n of E. Pa., Inc. v. City of Phila., 945 F.2d 1260, 1266 (3d Cir. 1991) (internal citations and quotations omitted).  Courts will deny litigants the opportunity to conduct additional discovery where "the discovery sought appears irrelevant to the issues to be adjudicated or if it is merely cumulative" or the party seeking to delay summary judgment relies only on "a 'hope' or 'hunch' that evidence creating an issue of fact will emerge at trial."  Wright & Miller, Federal Practice and Procedure 3rd Ed. § 2741.

---

Rule 56(f), which is therefore still in effect, provides that:
> When Affidavits Are Unavailable. If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> > (1) deny the motion;
> > (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> > (3) issue any other just order.

## III. DISCUSSION

### A. Whether the Treasury's Motion for Summary Judgment Is Premature

Mr. Boandl argues the defendant's motion is premature, claiming essentially that the administrative record created as a result of Mr. Boandl's numerous EEO complaints is incomplete. He asserts that the EEOC judge handling his cases "permitted limited time for discovery and excluded important information" and that he has yet to have a hearing on two of his more recent claims. Pl.'s Resp. In Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), 3.[7] Mr. Boandl claims the EEOC Administrative Law Judge failed to consider relevant law — including the Internal Revenue Service Restructuring and Reform Act of 1998, Public Law 105-206; the Rehabilitation Act of 1973, codified at 29 U.S.C. § 791; and an EEOC management directive requiring affirmative action for disabled persons — and the evidence of senior IRS Agent Frank Bucci. Pl.'s Resp., 27-28.

Mr. Boandl's claim is unsupported by a Rule 56(f) affidavit specifying what particular information he seeks through additional discovery, how that information would preclude summary judgment at this stage, and why that information was not discovered during the administrative process. Instead, Mr. Boandl has provided all the information he claims was ignored at the administrative level, including citations to and copies of the laws he believes are relevant and a sworn affidavit from Mr. Bucci. Because Mr. Boandl has cured the very defects

_____

[7] Instead of providing separate pagination for each document comprising Mr. Boandl's response to the motion for summary judgment, Mr. Boandl provided a brief response, a response to the defendant's statement of facts, his own statement of facts, and a memorandum in support of his opposition to the Treasury's motion for summary judgment as one document. Therefore, all page number citations refer to the entire response document and not to page numbers for each individual part.

he identified in the administrative record, and has failed to pinpoint relevant discoverable information pursuant to Rule 56(f), I believe the Treasury's motion is not premature and is instead ripe for consideration.

**B.     The Role of the Administrative Record**

_____It is well-settled law that federal employees are entitled to a trial de novo of their employment discrimination claims in federal court.  Chandler v. Roudebush, 425 U.S. 840, 96 S.Ct. 1949, 48 L. Ed. 2d 416 (1976) (finding that Section 706 of Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C.A. § 2000e-5(f)) authorizes both private and federal employees to sue on their own behalf after they have exhausted their administrative remedies with the EEOC); see also Morris v. Rumsfeld, 420 F.3d 287, 290 (3d Cir. 2005) (applying the standard in Chandler to claims of disability-based employment discrimination and stating that "[a] federal employee unhappy with the administrative decision may bring his or her claims to a district court, under Section 505(a) of the Rehabilitation Act, 29 U.S.C. § 794a(a), and receive the same de novo consideration that a private sector employee enjoys in a Title VII action, under 42 U.S.C. § 2000e-16(c)."). The Chandler Court found that the District Court erred when it ruled that "a trial de novo is not required . . . in all cases and that review of the administrative record is sufficient if an absence of discrimination is affirmatively established by the clear weight of the evidence in the record[.]" 425 U.S. at 843 (internal quotations omitted). Rather, it held that trial de novo was the method specifically identified by Congress for consideration of federal employee employment discrimination claims. Id. at 863.

A District Court faced with a well-developed administrative record, however, is not required to disregard it completely. Rather, the District Court's function in deciding a summary

-14-

judgment motion "is to determine whether any issues of fact exist. While we are entitled to review the administrative record, we are also entitled to consider new evidence presented by the parties, and are not bound in any way by the determinations made by the [administrative review boards] below." Cohen v. Austin, 861 F. Supp. 340, 350 (E.D.Pa. 1994).

The defendant cites little of the administrative record available in this case. Instead of relying on the evidence presented to the EEOC[8], the Department of Treasury[9], and the Merit Systems Protection Board[10] when these agencies considered Mr. Boandl's claims, or on the hearing transcripts created during each proceeding, the defendant cites only the written decisions issued. All three of these agencies dismissed Mr. Boandl's claims. In defense of its use of the decisions in place of the portions of the administrative record that support those decisions, the defendant explains that "the administrative record is immense" and that "in his response, plaintiff will counter with designated portions of the record." Def.'s Mem. In Support of Mot. For Summ. J., ("Def.'s Mem."), 20 n. 11. It relies largely on the statement of facts prepared by the EEOC administrative law judge because in reaching her decision, the ALJ "drew all inferences from the

---

[8] EEOC Judge Donna Nutter Rodwell issued a decision granting summary judgment in favor of the Treasury on Mr. Boandl's failure to promote claim, his failure to accommodate claim, his retaliation claims based on the issuance of failure to promote letters, and his retaliation claim based on the referral of his behavior to TIGTA. See Equal Opportunity Employment Commission Decision, Case Nos. TD 03-3215, 04-3091, and 05-2074M, Gov. Ex. 1.

[9] The Department of Treasury issued a decision on Mr. Boandl's claim that he was retaliated against when he received a negative reference from the Treasury Department in connection with his application for enrolled agent status. See Department of Treasury Final Agency Decision in the Matter of Richard Boandl v. Timothy F. Geithner, Secretary of the Treasury, Gov. Ex. 2.

[10] The Merit Systems Protection Board issued a decision on Mr. Boandl's claim that his retirement from IRS was involuntary. See Initial Decision in the Matter of Richard Boandl v. Department of the Treasury, Docket No. PH-0752-06-0018-1-1, Gov. Ex. 3.

record in the light most favorable" to Mr. Boandl.  Id. at 20.

I will assume the defendant's contention that Mr. Boandl has access to and will cite to relevant portions of the administrative record is correct, based on the fact that Mr. Boandl *did* rely on portions of the administrative record, including the deposition of Diane Heasley, in response to the motion for summary judgment.  Moreover, as noted above, the Mr. Boandl has provided the information he claimed the administrative agencies failed to consider, including the Rehabilitation Act, EEOC management directives, and the affidavits of Mr. Boandl's co-workers.

Where necessary, I will refer to and rely on the statements of fact contained in the written administrative decisions.  I will not, however, rely on agency conclusions of law.

### C.      Rehabilitation Act Claims

The first count of Mr. Boandl's complaint asserts numerous violations under the Rehabilitation Act.  "The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act . . . applicable to federal employers[.]"  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  Courts analyzing claims under the Rehabilitation Act have traditionally looked to the requirements of two distinct sections therein.  Section 504 provides that a "qualified individual with a disability" may not be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" any federal program *or* federally funded program.  29 U.S.C. § 794(a).  "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must initially show, '(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job.'"  Wishkin, 476 F.3d at 184-85 (citing Shiring

-16-

v. Runyon, 90 F.3d 827, 831 (3d Cir.1996)).

Section 501 of the Act creates even more stringent standards for the treatment of disabled employees, but applies only to federal agencies. See 29 U.S.C. § 791(b). Specifically, it requires that federal agencies utilize "affirmative action program plan[s] for the hiring, placement, and advancement of individuals with disabilities." Id. Such plans "shall include a description of the extent to which and methods whereby the special needs of employees who are individuals with disabilities are being met." Id.; see also Taylor v. Garrett, 820 F.Supp. 933, 936 (E.D.Pa. 1993) ("It is understood that Section 501, in addition to requiring nondiscrimination in federal employment, 'creates judicially enforceable rights to affirmative action in federal employment placement and promotion.'" (citing Davis v. United States Postal Serv., 675 F.Supp. 225, 231 (M.D.Pa. 1987))).

The EEOC management directive pertaining to the requirements of the Rehabilitation Act provides that:

> (a) Model employer. The Federal Government shall be a model employer of individuals with disabilities. Agencies shall give full consideration to the hiring, placement, and advancement of qualified individuals with disabilities.

> (b) ADA standards. The standards used to determine whether section 501 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 791), has been violated in a complaint alleging nonaffirmative action employment discrimination under this part shall be the standards applied under Titles I and V (sections 501 through 504 and 510) of the Americans with Disabilities Act of 1990, as amended (42 U.S.C. 12101, 12111, 12201), as such sections relate to employment. These standards are set forth in the Commission's ADA regulations at 29 CFR part 1630.

29 C.F.R. § 1614.203.

### 1. Failure to Accommodate

Defendant seeks summary judgment in its favor on Mr. Boandl's failure to accommodate

claim.  In this count, Mr. Boandl alleges that Ms. Heasley's refusal to issue him a cell phone as an accommodation for his disability violated the Rehabilitation Act.

The standards set forth in the Americans with Disabilities Act are to be used in evaluating accommodation claims under the Rehabilitation Act.  See 29 U.S.C. § 794(d).  Under the ADA, "an employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer."  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)).  When making an accommodation claim,  "[a]n employee can succeed under the Rehabilitation Act only if the employee can demonstrate that a specific, reasonable accommodation would have allowed [him] to perform the essential functions of [his] job."  Donahue v. Consol. Rail Corp., 224 F.3d 226, 232 (3d Cir. 2001) (internal citations and quotations omitted).  "[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee."  Id.  An employer is required to "initiate an informal, interactive process with the employee in need of an accommodation" in order to determine "the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations."  Taylor, 184 F.3d at 311-312; see also Mengine v. Runyon, 114 F.3d 415, 419 (3d Cir. 1997).  "[B]oth parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."  Mengine, 114 F.3d at 420.

The Third Circuit has articulated the standard to be applied to reasonable accommodation claims under the Rehabilitation Act:

> To make out a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating (1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job. The plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer.

Donahue, 224 F.3d at 229 (citing Shiring, 90 F.3d at 831). Reasonable accommodations include "measures such as 'job restructuring, part-time or modified work schedules . . . acquisition or modification of equipment or devices . . . and other similar accommodations for individuals with disabilities." Freeman v. Chertoff, 604 F. Supp. 2d 726, 734 (D.N.J. 2009) (citing 42 U.S.C. § 12111(9)(B)). It is also possible to state a claim for failure to accommodate based on an employer's failure to engage in the interactive process. "An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010) (citing Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir.2004)).

The defendant does not dispute that Mr. Boandl was a qualified individual with a disability and that he could perform the essential functions of his position with or without an accommodation. Rather, it seeks dismissal on the ground that there was no essential job function

Mr. Boandl was unable to perform without the aid of a cell phone, relying on the EEOC's conclusion of the same. Def.'s Mem., 40; Def.'s SMF ¶ 38. It also relies on the EEOC decision for its argument that, during the relevant period, IRS did not issue cell phones to any employees holding Mr. Boandl's position. Def.'s SMF ¶ 39. However, ALJ Rodwell's findings of fact on this charge are sparse — she explains only that Mr. Boandl requested a cellular telephone as a reasonable accommodation and that Ms. Heasley denied his request. See EEOC Decision, Gov. Ex. 1. It is only in the analysis portion of the decision that ALJ Rodwell specifically mentions Ms. Heasley's testimony on this subject. Id. ("An Agency is not required to provide a requested accommodation if it does not assist a disabled employee to perform the essential functions of his . . . job[.] . . . Ms. Heasley testified that Complainant did not need a cell phone to do his job, and that he could wait until he returned back from a field visit to return any pages received on his pager.").

Mr. Boandl responds that the government is not entitled to summary judgment on this claim because the evidence indicates that it failed to engage in the interactive process. Pl.'s Resp., 37. Mr. Boandl points to the report prepared by Reasonable Accommodation Specialist Michael Bailey in connection with Mr. Boandl's request. The Report indicates that:

> The employee is requesting that he be issued a cellphone so that he would be able to return calls while in the field without having to locate a telephone which is complicated by his disability. The manager indicated that immediate response while in the field is not an essential function of the job. The manager verbally denied the request because of the previously stated that [sic] the need does not address an essential function of the job.

Reasonable Accommodation Report, Pl.'s Ex. 41. Mr. Boandl claims this report is evidence that Ms. Heasley denied his request without first determining whether a cell phone was a reasonable

and manageable accommodation and therefore failed to engage in the interactive process.

The defendant does not dispute that Mr. Boandl put it on adequate notice that he was requesting an accommodation for his disability, and I believe Mr. Boandl has provided evidence that would allow a factfinder to conclude that the defendant failed to engage in the interactive process because Ms. Heasley denied his request summarily. However, "[t]he interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." Taylor, 184 F.3d at 317. In other words, even if the defendant failed to engage in the interactive process, Mr. Boandl still must ultimately show that a cell phone was required for him to perform the essential functions of his job as a revenue agent. Mr. Boandl claims that the reason identified by Ms. Heasley for his request — that he be able to immediately return pages from the office while in the field — was not the sole reason for his cell phone request. Rather, he claims that he had investigative duties outside the office requiring use of a cell phone, including locating tax non-filers and visiting witnesses. Pl.'s Resp. To Def.'s SMF, ¶ 38. He claims that his disability made finding and using pay telephones to perform these duties a hardship. Id.

The defendant does not present evidence that locating non-filers and witnesses was *not* an essential function of Mr. Boandl's position. It relies largely on the EEOC decision in support of its argument, and in that decision, the ALJ cited testimony from Ms. Heasley that Mr. Boandl did not need to return pages immediately and that cell phones were not issued to other Revenue Agents. EEOC Decision, 8. I believe summary judgment in favor of the defendant is not merited on this claim. Mr. Boandl has presented evidence sufficient to create an issue of fact whether a

cell phone was a reasonable accommodation. Although Ms. Heasley and the defendant frame

Mr. Boandl's request as relating only to his ability to return pages from the office while he was in

the field, Mr. Boandl has identified other tasks — including locating non-filers and witnesses —

that he claims required the use of a payphone and were made more difficult because of his

disability.

Because Mr. Boandl has satisfied his prima facie burden, the government must show that

his requested accommodation is unreasonable or would cause an undue hardship. Ms. Heasley's

testimony, as described by the EEOC ALJ, does not establish "that the accommodations

requested by [Mr. Boandl] are unreasonable or would cause an undue hardship." See Donahue,

224 F.3d at 229. Therefore, I will deny the government's motion for summary judgment on this

claim.

### 2.    Retaliation

Just as the Rehabilitation Act borrows the ADA's standards for accommodation claims, it

borrows as well the ADA framework for retaliation claims. See 29 U.S.C. § 794(d); 42 U.S.C. §

12203; Venter v. Potter, 694 F. Supp. 2d 412, 427 (W.D.Pa. 2010). Therefore, the familiar

McDonnell-Douglas framework utilized in ADA cases is also applicable in this context.[11]

> To establish a prima facie case of retaliation under the [Rehabilitation Act],
> a plaintiff must show: (1) protected employee activity; (2) adverse action by
> the employer either after or contemporaneous with the employee's protected
> activity; and (3) a causal connection between the employee's protected

---

[11] Since Mr. Boandl has not set forth direct evidence of discrimination, the United States
Supreme Court's analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36
L. Ed. 2d 668 (1973), applies to his claims. "Direct evidence is 'so revealing of discriminatory
animus that it is not necessary to rely on any presumption from the prima facie case to shift the
burden of production.'" Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 818 n. 16 (E.D.Pa.
2005) (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir.1998)).

> activity and the employer's adverse action. . . . If an employee establishes a prima facie case . . . the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. . . . If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-501 (3d Cir.1997) (internal citations and quotations omitted); see also Ozlek v. Potter, 259 Fed.Appx. 417, 421-422 (3d Cir. 2007) (non-precedential opinion).

As to the first element of a retaliation claim, the defendant does not dispute that filing an EEO complaint and making a request for a reasonable accommodation are protected employee activities. See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003). The issue here is whether Mr. Boandl has met the second and third elements required to state a prima facie case.

It is well-settled that materially adverse employment actions are not necessarily "workplace-related or employment-related retaliatory acts and harm." Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 66, 126 S.Ct. 2405, 2412-2413 (2006)). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68, 126 S.Ct. at 2415 (internal citations and quotations omitted). Courts must "remain mindful that it is important to separate significant from trivial harms because an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at

work and that all employees experience." Moore, 461 F.3d at 346. Determinations about whether acts are materially adverse or simply part of a normal workplace "depend on the totality of the circumstances." Id. ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." (citing Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990))).

The third prima facie element of a retaliation claim is the establishment of a causal connection. In order to establish a causal connection between engagement in protected activity and an adverse employment action, a plaintiff must demonstrate either (1) a temporal proximity between the two events that is "unusually suggestive" of retaliation, or (2) timing plus other evidence, such as evidence that the employer engaged in a "pattern of antagonism" with the plaintiff. Luckiewicz v. Potter, 670 F. Supp. 2d 400, 411 (E.D.Pa. 2009) (citing Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 760 (3d Cir. 2004), and Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (finding that even absent temporal proximity, an employee showed a causal connection where he was subjected to a barrage of written and verbal warnings, inaccurate point totalings, and disciplinary action)).

Mr. Boandl sets forth a number of acts he claims constituted retaliation for his filing of EEOC complaints in August of 2003 and February of 2004. He claims that after he was denied the promotions and the accommodation request, he was "subjected to retaliation and harassment, denied proper evaluations, such as recognition for commendations and special achievements, subjected to pretextual evaluations and discipline, [and] subjected to retaliatory investigations[.]" Boandl Compl. ¶ 28. He claims has was further retaliated against when he was given a negative evaluation in response to the OPR investigation into his application for enrolled agent status. Id.

¶ 29. Instead of setting forth each instance of retaliation individually, Mr. Boandl refers in his complaint to patterns of retaliation. See id. at ¶ 32 (complaining of subjection to "an unrelenting pattern of retaliation, harassment, and an ever increasing hostile work environment"); ¶ 37 ("Ms. Heasley's ongoing retaliatory harassment . . was followed by a pattern of intimidation designed to justify an illegal, intolerable, and hostile work environment[.]").

The government separates Mr. Boandl's Rehabilitation Act count into three distinct retaliation claims: (1) retaliation in the form of the TIGTA investigation and referral; (2) retaliation in the form of the negative performance reviews and the issuance of the opportunity to improve letter; and (3) retaliation in the form of the comments made to OPR in connection with Mr. Boandl's application for enrolled agent status. See Def.'s Mem., 42-52. I believe that this is a valid construction of Mr. Boandl's complaint, and I will discuss each claim in turn.

### a. TIGTA Referral

The defendant claims the referral of Mr. Boandl's issuance of a complimentary taxpayer letter to TIGTA did not constitute an adverse employment action. It argues that referral of an incident to an independent investigative body would not dissuade a reasonable worker from making a charge of discrimination. It support of its argument, the defendant cites Simmington v. Gates, where the reviewing court found that plaintiff's retaliation claim was not supported by the evidence where the alleged materially adverse actions included investigation of the plaintiff's work attendance and giving the plaintiff an "unacceptable" rating in an employee evaluation.[12]

---

[12] The defendant also cites cases from the Southern District of Texas and the District of Columbia. I reject its reliance on Coyle v. Snow, as the reviewing court in that case stated that its refusal to recognize a TIGTA referral as an adverse employment action was due to the fact that "[t]he Fifth Circuit has construed the 'adverse employment action' element of a retaliation claim in a 'stricter sense' than other circuits, holding that only an employer's 'ultimate

No. 08-3169, 2010 WL 1346462 (D.Md. Mar. 30, 2010). In response, Mr. Boandl relies on

Porter v. Shah, a case from the District of Columbia Circuit in which the District Court's grant of

summary judgment in favor of the defendant was overturned insofar as it concluded that an

assessment of the plaintiff did not constitute a materially adverse action for purposes of a

retaliation claim. 606 F.3d 809, 818 (D.C. Cir. 2010). The court reasoned that the assessment, a

"Notification of Unacceptable Performance" that "informs an employee that his or her

performance teetered on the lowest rating possible for an Agency employee," was placed in the

plaintiff's personnel file instead of retained in the operating unit as was agency custom; that it

was accompanied by a 120-day Performance Improvement Pan outlining the activities necessary

to upgrade the employee's level to "needs improvement;" and that it exposed the plaintiff to

"removal, reduction in grade, withholding of within grade increase or reassignment." Id. Given

these potentially serious consequences, and the nature of the performance improvement plan, the

court found plaintiff had shown the existence of a materially adverse action. Id.

Porter is more relevant to Mr. Boandl's negative performance evaluation claim than to his

claim that referral to TIGTA was an adverse employment action. The consequences of the

negative performance appraisal to the plaintiff in Porter were simply not present for Mr. Boandl

as a result of the TIGTA referral. TIGTA is an independent agency whose audit and

investigative duties are designed to detect and deter fraud and abuse in IRS programs and

activities, and to protect IRS employees against external attempts at corruption. Def.'s SMF ¶

47. Mr. Boandl has neither alleged nor shown that referral to this independent agency exposed

---

employment decision' can provide the basis for a Title VII retaliation claim." No. H-04-0244, 2006 WL 696652 at *6 (S.D.Tx. Mar. 20, 2006).

him to removal from his position or reduction in grade.  Mr. Boandl does attempt to dispute

Treasury's characterization of TIGTA's role and the nature of the investigation initiated by Ms.

Heasley and Mr. Briggs.

Instead, Mr. Boandl appears to claim that the TIGTA investigation was materially adverse

because it encompassed not only his issuance of a complimentary letter to a taxpayer, but also the

IRS's receipt of letters *from* taxpayers complimenting Mr. Boandl's work.  Pl.'s Resp. To Def's

SMF, ¶ 46.  The TIGTA report confirms this allegation, revealing that Ms. Heasley told

investigators Mr. Boandl violated IRS policy by issuing summonses to taxpayers without

approval from management and that he conducted an audit in violation of established guidelines;

and that Mr. Briggs expressed suspicion to investigators that Mr. Boandl asked a taxpayer to send

the IRS a complimentary letter about him.  TIGTA Report, Pl.'s Ex. 4.  However, the fact that

Mr. Boandl's supervisors spoke to investigators about other aspects of Mr. Boandl's work in

connection with the investigation does not make the initiation of that investigation a materially

adverse employment action.

Mr. Boandl also claims that the TIGTA referral "was a request for a criminal

investigation."  Pl.'s Resp. To Def.'s SMF ¶ 47.  This allegation is simply unsupported.  The

TIGTA report states that an Assistant United States Attorney "declined prosecution of Boandl in

liue of handing the matter administratively."  TIGTA Report.  The fact that a TIGTA

investigation *may* lead to criminal prosecution of an IRS employee or an external actor does not

make every TIGTA referral a request for prosecution.

The undisputed facts are that Mr. Boandl sent a complimentary letter to a taxpayer

lauding the services of a tax preparer.  IRS guidelines prohibit an IRS agent from recommending

the services of a tax preparer.  Mr. Boandl's supervisors sought the assistance of an external,

independent body to determine whether Mr. Boandl's issuance of the letter violated IRS

guidelines.  Mr. Boandl has presented no evidence that the referral, in itself, could have or did

alter the terms of his employment, and he has presented no evidence that this referral would have

dissuaded an objective worker from pursuing a claim of discrimination; indeed, there were no

ramifications of the investigation beyond the issuance of a report of investigation.[13]  I do not

believe an objective employee aware of the IRS guidelines and the independent nature of TIGTA

would have been chilled from pursuing his rights because of the initiation of a TIGTA

investigation.

     Therefore, I will not address whether Mr. Boandl has met the third element of a prima

---

[13]  The defendant further argues that the TIGTA referral cannot constitute an adverse
employment action because "the record shows that the referral and resulting investigation and
report did not deter [Mr. Boandl's] EEO activity."  Mem. In Support, 45.  The defendant cites
Mr. Boandl's filing of his second EEO complaint days after the TIGTA referral, and filing of a
third EEO complaint based on the TIGTA referral.  Id.  The standard articulated by the Supreme
Court in Burlington Northern is whether "a *reasonable* employee would have found the
challenged action materially adverse," not whether the plaintiff found the challenged action
materially adverse.  Burlington Northern, 548 U.S. at 67-68 (emphasis added).  The Court was
adamant: "We refer to reactions of a *reasonable* employee because we believe that the
provisions's standard for judgment harm must be objective.  An objective standard is judicially
administrable.  It avoids the uncertainties and unfair discrepancies that can plague a judicial
effort to determine a plaintiff's unusual subjective feelings."  Id. at 68-69 (emphasis in original).
    Other courts have accepted this "subjective response" argument.  See Sykes v.
Pennsylvania State Police No. 05-1349, 2007 WL 141064 at *6 (W.D.Pa. Jan. 17, 2007) ("The
court does not detail the specific instances of retaliation described by Sykes since it is clear that
they are not actionable under the standard set out in Burlington. These actions, whether
characterized as major or minor, did not deter Sykes's pursuit of new and expanded allegations of
discrimination, either internally or administratively."), aff'd 311 Fed.Appx. 526 (3rd Cir. Apr 04,
2008).  While Mr. Boandl's continued and persistent pursuit of his EEO claims following the
referral makes the "subjective response" argument an attractive one, I will not rely on it here
because it appears to conflict with the Supreme Court's ruling in Burlington Northern and
because other evidence makes clear that the TIGTA referral was not an adverse employment
action.

facie case.

**b.      Negative Performance Evaluations**

The defendant argues that the negative performance evaluations Mr. Boandl received are not legally sufficient to constitute adverse employment action, but focuses its brief on the argument that "he cannot designate record facts creating a genuinely triable issue that Ms. Heasley's well-grounded business reasons for the at-issue performance evaluations and opportunity letter were pretexts for retaliation." Def.'s Mem., 50.

Although the defendant essentially concedes that, viewing the evidence in the light most favorable to Mr. Boandl, the negative performance evaluations constitute an adverse employment action, I will briefly address Mr. Boandl's arguments on this claim. Mr. Boandl was issued negative performance evaluations following the TIGTA referral. Those appraisals were significantly worse than those he received before 2004. In his performance evaluation for the period from July 1, 2001 until May 20, 2002, Mr. Boandl's summary level evaluation rated him as exceeding the "fully successful" standard in job performance. Boandl Ex. 20. The written evaluation accompanying this rating did not raise any problems. Id. In his appraisal for the period from February 24, 2003 until May 30, 2003, Mr. Boandl was rated as meeting or exceeding all performance rating standards. Ex. 9 to Boandl EEOC Complaint filed Nov. 11, 2004, Boandl Ex. 5.

Along with the negative performance evaluation, Ms. Heasley issued Mr. Boandl an Opportunity to Improve letter affording him 120 days to improve his performance, informed him that his work would be periodically reviewed, and told him that if he did not improve his performance, he would face termination. Under the <u>Burlington Northern</u> standard, I believe an

objective person would be dissuaded from pursuing a claim of discrimination following this treatment. Compare Counts v. Shinseki, No. 08-85, 2010 WL 3810662 at *10 (W.D.Pa. Sep. 23, 2010) (finding that a material fact existed whether work reassignments and retrieval of plaintiff's government issued laptop constituted adverse employment actions) with Clayton v. Pa. Dept. Of Public Welfare ex. Rel. Richman, No. 05-0768, 2007 WL 575677 at *10 (M.D.Pa. Feb. 20, 2007) (finding that "*de minimis* administrative decisions" such as moving plaintiff's mailbox, refusing to give him an office in the location he desired, and requiring him to follow a hospital-wide office hours policy did not constitute materially adverse actions) *aff'd* 304 Fed.Appx. 104 (3d Cir. 2008).

Because Mr. Boandl has stated the first and second elements of a prima facie case, I must consider whether he has shown a causal connection between his activity and the retaliatory acts. I believe that he has. A causal connection is established with evidence of temporal proximity between the protected activity and a retaliatory act that is unusually suggestive of retaliation, or mixed evidence of the timing and other elements, such as evidence that the employer engaged in a pattern of antagonism with the plaintiff. The time that elapsed between Mr. Boandl's filing of his second EEO complaint and the issuance of the negative performance evaluation and improvement plan was about a month. That fact, combined with other evidence, including the TIGTA referral and antagonistic relations between Mr. Boandl and Ms. Heasley, could allow a factfinder to find a causal connection. See Krouse, 126 F.3d at 503-04 (holding that "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.").

Because I believe Mr. Boandl has made a prima facie retaliation claim based on the

issuance of a negative performance evaluation and improvement plan, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for Mr. Boandl's evaluation and performance plan. The defendant presents the written evaluation prepared by Ms. Heasley, arguing, in essence, that the document speaks for itself. Indeed, the letter includes six pages citing in great detail the problems with Mr. Boandl's work, including his issuing taxpayer summonses without management approval; failing to advise a taxpayer of his rights before commencing an investigation; failing to otherwise communicate with taxpayers in an acceptable manner; failing properly to document his hours worked per case; and failing timely to complete work, prioritize work, and gather information properly. March 24, 2004 Written Performance Evaluation, Def.'s Resp. To Complaint, Ex. C. These are all legitimate, nondiscriminatory reasons for Ms. Heasley's issuance of the negative performance evaluation.

Therefore, the burden shifts back to Mr. Boandl to present evidence that would be sufficient to convince a factfinder that the reasons offered for the negative evaluation were false, and that retaliation was the real reason for the evaluation and performance plan. In order to meet this burden, he must either (i) "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon," the defendant's proffered reason for its adverse employment action; or (ii) "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision[.]" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Although the plaintiff need not present evidence beyond that supporting his prima facie case to survive summary judgment, he must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a

reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the proffered non-discriminatory reason 'did not actually motivate' the employer's action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (citations omitted).

Mr. Boandl fails to address or discredit each of the elements of the negative performance evaluation he received. Rather, in support of his claim, he presents generalized evidence that: (1) the performance evaluation he received was a significant deviation from evaluations issued prior to Ms. Heasley's supervision of Mr. Boandl; (2) Mr. Boandl had a history of positive work evaluations and commendations from the IRS; (3) Mr. Heasley treated Mr. Boandl differently than others by singling him out for discipline due to his issuance of a complimentary taxpayer letter; (4) Ms. Heasley singled Mr. Boandl out for other demeaning treatment. The haphazard presentation of Mr. Boandl's brief makes it difficult to label his argument with any degree of certainty, but, because he fails to offer any evidence that Ms. Heasley's evaluation of his performance was unfounded, I will assume that he seeks to avoid summary judgment on the second ground articulated in Fuentes; that is, he claims Ms. Heasley relied on illegitimate factors in issuing the evaluation.

I believe Mr. Boandl has met his burden. In support of his claim, Mr. Boandl provided a copy of a letter of appreciation sent to him from Jerome Lisuzzo, the Special Agent in charge at the Criminal Investigation Section of the Philadelphia Field Office, on January 5, 2004, after Ms. Heasley's referral of Mr. Boandl's claim to TIGTA and before her issuance of the opportunity to improve letter. The letter of appreciation recognizes Mr. Boandl for providing information to the Criminal Investigation division which led to the filing of felony charges and successful prosecution of a tax non-filer. Id., Ex. 14 to Boandl Ex. 5. Mr. Boandl also includes evidence of

commendations and positive recognition for his work dating back to the 1980's, arguing that because "analysis of the timing and sequence of events" is essential, Mr. Boandl's performance history must be taken into consideration in determining whether the defendant's performance evaluation was pretextual. Pl.'s Resp., 29. Evidence that an employee has a history of positive work evaluations is relevant to support a showing of pretext. See Steward v. Sears Roebuck & Co., 312 F. Supp. 2d 719, 728 (E.D.Pa. 2004).

With regard to the choice to refer Mr. Boandl to TIGTA for investigation, Frank Bucci, an Internal Revenue Agent, attested that "there would be nothing unusual for an Agent to compliment a taxpayer or taxpayer representative where the audit revealed excellent tax books and records." Bucci Affidavit, Boandl Ex. 8. Adam Florkowski, a former co-worker of Mr. Boandl's who was also supervised by Ms. Heasley, claims he recalled times he complimented a taxpayer or a taxpayer's representative when records were well-prepared. Florkowski Affidavit, Boandl Ex. 10. Although I do not find the TIGTA referral constituted an adverse employment action, evidence that Mr. Boandl was treated differently than his coworkers for sending a complimentary letter could be construed by a factfinder as evidence of retaliatory animus. Mr. Boandl has also offered further evidence concerning Ms. Heasley's treatment of Mr. Boandl. In an affidavit, Mr. Florkowski testified that he observed Ms. Heasley scolding Mr. Boandl about an error on a payroll time report publicly and using an abusive tone. See Florkowski Affidavit. Mr. Boandl stated in his affidavit that, in late September, 2003, Ms. Heasley also accused Mr. Boandl of choosing a particular stamp in order to mock the addressee of a letter he had sent and that she made other accusations against him. Boandl Affidavit at 6-7.

I believe that Mr. Boandl's proferred evidence — that his past work evaluations were

positive; that his work was exceeding the expectations of others only weeks prior to Ms. Heasley's issuance of the negative evaluation; and that Ms. Heasley singled Mr. Boandl out for negative treatment both publicly and in private around the time the negative performance evaluation was issued — creates an issue of fact whether Ms. Heasley's stated reasons for her evaluations of Mr. Boandl were pretextual. At least one other court in this District has accepted such reasoning. See Long v. Thomson Industries, Inc., No. 99-1693, 2000 WL 1586078 at *9 (E.D.Pa. Oct. 24, 2000) (finding that the timing of negative evaluations after plaintiff filed a complaint of discrimination, the transfer of plaintiff to a different department, and evidence of continuing altercations with management "provide sufficient circumstantial evidence for a reasonable jury to conclude that [defendant's justification for negative performance evaluations] is pretextual.").

Therefore, I will deny the defendant's motion for summary judgment on Mr. Boandl's retaliation claim based on issuance of the negative performance evaluation.

### c.       Negative Reference for Enrolled Agent Application

The defendant argues that Mr. Boandl's claim of retaliation in connection with the reference provided by Charles Brantley to the OPR does not constitute an adverse employment action. I agree.

In order to make a claim for post-employment retaliation, a plaintiff must show that he engaged in protected activity, that his former employer had influence over a subsequent employment-related decision, and that his former employer made a retaliatory use of that influence to the detriment of the plaintiff's employment opportunities." See Charlton v. Paramus Bd. Of Educ., 25 F.3d 194, 200-201 (3d Cir. 1994) ("[W]e . . . hold that an ex-employee may file

a retaliation action against a previous employer for retaliatory conduct occurring after the end of the employment relationship when the retaliatory act is in reprisal for a protected act . . . and arises out of or is related to the employment relationship.").  A former employer engages in retaliation where its action "results in discharge from a later job, a refusal to hire the plaintiff, or other professional or occupational harm."  Id. at 200.  In essence, post-employment retaliation must "involve[] some harm to an employee's employment opportunities."  Nelson v. Upsala College, 51 F.3d 383, 388 n.6 (3d Cir. 1995).

It is undisputed that Mr. Brantley, as an IRS director, provided information from Mr. Boandl's file to OPR at its request.  Def.'s SUF ¶ 77.  Even if that information was untrue or misleading, as Mr. Boandl claims it was, there was no adverse effect on Mr. Boandl.  He was given the opportunity to provide additional information to OPR beyond that provided by Mr. Brantley, and after he did, he was granted enrolled agent status.  Mr. Boandl has simply failed to allege a post-employment adverse action that caused harm to his employment opportunities.

### D.     Age Discrimination in Employment Act Claim for Failure to Promote

In the second count of his complaint, Mr. Boandl sets forth a claim under the ADEA.  He argues that "in the evaluation and ranking process for [his] application[s] for promotion . . . his greater credentials and professional skills, under objective standards were ignored" and that he was "subjected to unequal evaluation standards as compared with younger employees lacking his broad range of experience."  Boandl Compl. ¶ 53.

The ADEA protects federal employees over the age of 40 from age-based employment discrimination.  Claims under the ADEA are analyzed under the McDonnell-Douglas burden shifting framework.  Barber v. CSX Distribution Serv., 68 F.3d 694, 698 (3d Cir. 1995).  A

failure to promote claim under the ADEA is analogous to a failure to hire claim.  Id.  In order to state a prima facie case of discrimination, a plaintiff must show (1) that he belongs to the protected class; (2) that he applied for and was qualified for the job; (3) that he was rejected despite being qualified; and (4) under circumstances that raise an inference of discrimination, the employer continued to seek out individuals with qualifications similar to plaintiff's or treated more favorably those not in the protected class.  Id. (citing Fowle v. C&C Cola, 868 F.2d 59, 61 (3d Cir. 1989)); see also Maxwell v. Springer, 274 Fed.Appx. 186, 188 (3d Cir. 2008).  Once the plaintiff makes a prima facie case, the burden shifting framework comes into play.  The defendant must articulate a legitimate, non-discriminatory reason for rejecting the plaintiff for the promotion, and if the defendant does so, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's explanation is pretextual.  See Fuentes, 32 F.3d at 763; see also Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).

The defendant does not appear to dispute that Mr. Boandl has made a prima facie case of age discrimination.  See Def.'s Mem., 53.  Mr. Boandl was 54 years old at the time he applied for vacant Revenue Agent positions in March and May of 2003.[14]  He claims he was qualified for the positions and the defendant concedes as much.  He was rejected for both positions, and the individuals who were chosen for the positions were a forty-nine year old woman and a thirty-eight year old woman, respectively.  I will assume, because the defendant has, that he has made out a prima facie case.

---

[14]  Although Mr. Boandl applied for these positions separately, the application process for each position was the same and the standards and procedures used by the defendant to determine which applicants for the positions were "best qualified" were also the same.  Therefore, I will consider the claims coextensively where possible.

Therefore, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for rejecting Mr. Boandl for the positions. The defendant's burden here is "relatively light." Fuentes 32 F.3d at 763. The defendant claims Mr. Boandl was not chosen for either position because the ranking scores he received were below the scores the respective ranking panels had designated as "best qualified." One part of his ranking score was based on a performance evaluation he received prior to applying for the job. The other part of his overall score was based on a subjective score for potential. The defendant has met its burden. Uniform reliance on past performance evaluations to make hiring or promotion decisions is legitimate and nondiscriminatory. See Bray v. Marriot Hotels, 110 F.3d 986, 993-97 (3d Cir. 1997) (finding that use of evaluation scores was a legitimate reason for making promotion decisions, and that only evidence of discrepancies in the evaluation of the scores raised an inference of pretext); D'Amico v. Pulte Homes, Inc., No. 08-1099, 2009 WL 792344 at *3 (E.D.Pa. Mar. 23, 2009) (finding that reliance on poor performance scores in decision not to promote was legitimate and nondiscriminatory).

Therefore, the burden shifts back to Mr. Boandl to show that the government's stated reason for its rejection of his applications for promotion was pretextual and that the real reason he was denied the promotions was discrimination. Mr. Boandl relies on blanket assertions in arguing that the defendant's stated reasons are pretextual. For example, he states that the two females chosen for the positions were "younger [and] far less experienced[.]" Pl.'s Resp., 28. He fails to offer, in his brief or in his affidavit, an explanation for his argument that the individuals chosen for the position were far less experienced. He has knowledge about the other selectees' records, but makes no specific arguments concerning them, nor offers them as evidence in

support of his claim.  See Boandl Affidavit at 3-4 ("I recognized that under objective standards, I was far more qualified than the selectees. . . .  I had more education, more diverse experience, and more years of experience. . . . In real contrast, the two younger selectees without disabilities lacked my years of diverse experience and special accomplishments.  Their records do not show comparable commendations from the Commissioner of the IRS, or numerous complimentary letters from both taxpayers and tax preparers, or commendations from other segments of the IRS[.]"); Boandl SMF ¶ 28 ("Most of the experience of the two younger selectees was in the area of general enforcement [.]  In sharp contrast, Boandl worked not only in general enforcement but, in addition, he had experience in special enforcement related to taxpayers found to be engaging in illegal activities, such as embezzlement, drug trafficking, illegal gambling, and other illegal activities.").  Mr. Boandl does not explain how the absence of letters of commendation in the records of the selectees makes them less experienced than he, and nowhere has defendant argued that letters of commendation, or experience in criminal tax enforcement, were considered in making the promotion decisions.  A plaintiff's reliance on factors he, but not the employer, deems important in making hiring and promotional decisions is not valid to show pretext.  See Simpson, 142 F.3d at 638.[15]

The defendant's undisputed evidence shows that the five individuals designated as "best

_____

[15]  In Simpson, the court concluded that the plaintiff's reliance on Bray, *supra,* was misplaced because "in Bray, we found that various discrepancies in how the employer evaluated the criteria purportedly relied on to promote a white person over the black plaintiff, was sufficient to raise questions of fact as to the employer's motives.  Bray, however, is clearly distinguishable. In Bray the discrepancies were in the use of criteria identified as determinative by the employer, see id., whereas in this case [the plaintiff] is pointing to discrepancies between a criterion identified by [the defendant] (sales quotas) and a criterion asserted only by [the plaintiff] (evaluation scores). As we have said, the focus is on the criteria identified by the employer, not the criteria only the plaintiff thinks are important."  142 F.3d at 638.

qualified" for the March positions were between the ages of forty-two and fifty years old; and the individuals so designated for the May position were between the ages of thirty-eight and fifty-five. Although all the individuals who were "best qualified" for the first opening were younger than Mr. Boandl, the individual chosen for the March position was a mere five years younger than he. Although the individual ultimately chosen for the May position was significantly younger (thirty-eight compared to Mr. Boandl's fifty-four) an individual *older* than Mr. Boandl was among those designated best qualified. Because Mr. Boandl offers absolutely no evidence to counter this strong evidence that the government's selection process was not the result of age discrimination, and because he has identified no discoverable evidence that provides support for his claim, I will grant defendant's motion for summary judgment on this claim.

### E.     Title VII Claim for Failure to Promote

Mr. Boandl also claims the promotion selection process violated Title VII of the Civil Rights Act, which outlaws discrimination on the basis of sex. Although men are not traditionally the protected class under Title VII, they may still assert reverse discrimination claims. Such claims are governed by the <u>McDonnell Douglas</u> burden shifting framework. <u>Iandimarco v. Runyon</u>, 190 F.3d 151, 157 (3d Cir. 1999). In order to make a prima facie case of reverse discrimination in violation of Title VII, a plaintiff must "present sufficient evidence to allow a fact finder to conclude that [the defendant] is treating some people less favorably than others based upon a trait that is protected under Title VII." <u>Id.</u> at 161.

The defendant does not appear to dispute that Mr. Boandl has stated a prima facie case of reverse discrimination in connection with his rejections for promotion. He was a male who applied and was qualified for the promotions, he was rejected, and women were chosen for both

positions. The defendant again cites its ranking panel process in setting forth a legitimate, nondiscriminatory reason for its decision to offer the promotions to other applicants. Because I have already found that the explanation offered by defendant for its selection is legitimate, I will not discuss this element again. Just as Mr. Boandl failed to offer any evidence or identify any discoverable evidence supporting his claim that the defendant discriminated on the basis of age in making the promotion decisions, he has failed to do so with respect to gender. Moreover, the evidence strongly supports the defendant's contention that there was no discrimination in its decision. Of the applicants who were ranked "best qualified" for the March position, four were men and one was a woman; of the May applicants, three were men and one was a woman. Again, this evidence belies any inference of discrimination, and Mr. Boandl points to no evidence creating an issue of fact whether the defendant had discriminatory motives when it made its promotion decisions.

Therefore, I will grant the defendant's motion for summary judgment on this claim.

### F. Hostile Work Environment Claim

Mr. Boandl appears to assert hostile work environment claims in each count of his complaint. Courts in this Circuit have recognized a plaintiff's right to assert a hostile work environment claim under the Rehabilitation Act, see Miller v. Cohen, 52 F. Supp. 2d 389, 400 (M.D.Pa. 1998) aff'd, 185 F.3d 862 (3rd Cir. 1999); Title VII, see Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996); and the ADEA, see Fries v. Metro. Mgmt. Corp., 293 F.Supp.2d 498, 504 (E.D.Pa. 2003) aff'd Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506 (3d

Cir. 2004).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L. Ed. 2d 106 (2002). In order to state a claim for hostile work environment, a plaintiff must prove five elements: (1) the plaintiff suffered intentional discrimination because of his disability, gender, or age; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001). "[H]arassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" Andrews, 895 F.2d at 1484. To determine whether discrimination is sufficiently hostile to create employer liability, a reviewing court must look at the totality of the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L. Ed. 2d 295 (1993)). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 545 (W.D.Pa. 2009) (citing Abramson v. William Paterson College of New Jersey, 260 F.3d 265 (3d Cir. 2001)). Even conduct that is unquestionably offensive and rude will not rise to the level required to make out a hostile work

environment claim unless it is sufficiently severe.  See Saidu-Kamara v. Parkway Corp., 155 F.

Supp. 2d 436, 439-440 (E.D.Pa. 2001) (finding that defendant's repeated making of suggestive

sexual comments, patting plaintiff on the buttocks and breast, and making harassing comments

about plaintiff's family background and poverty were not sufficient to state a claim for hostile

work environment).  Rather, the conduct must be objectively severe and serious.[16]

        The defendant claims Mr. Boandl has not stated a hostile work environment claim

because he has not alleged harassment that was severe and pervasive.  Mr. Boandl, on the other

hand, claims the discrimination he suffered was "unrelenting" and that his work environment was

"intimidating and threatening"  Boandl Compl. ¶¶ 38, 48.  In his affidavit, he provides specific

examples of this treatment, claiming (1) that he was "harassed each time [he] had contact with

Ms. Heasley;" (2) that Ms. Heasley accused him of choosing a particular stamp in order to mock

the addressee of a letter; (3) that Ms. Heasley accused him of unauthorized use of the internet

after he informed her that he had used the internet to perform case related research; (4) that Ms.

Heasley "chastis[ed] [him] in a demeaning manner in the presence of fellow employees and a

visitor"; (5) that Ms. Heasley accused him of disrespecting the privacy rights of a taxpayer; (6)

that in August of 2004, when Mr. Boandl returned to work to turn in his case files, Ms. Heasley

_____

        [16]  Just as courts must review retaliation claims under an objective standard, that standard
applies as well to hostile work environment and constructive discharge claims.  See Burlington
Northern, 548 U.S. at 68 ("We refer to reactions of a reasonable employee because we believe
that the provision's standard for judging harm must be objective. An objective standard is
judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a
judicial effort to determine a plaintiff's unusual subjective feelings." (citing Penn. State Police v.
Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) for use of an objective
standard in constructive discharge claims, and Harris, 510 U.S. at 21 for use of an objective
standard in hostile work environment claims)).

failed to show or voice any concern for him when he tripped outside her cubicle. See Boandl

Affidavit, 6-15. Mr. Boandl also claims the TIGTA referral and negative performance

evaluations, and repeated instances where Ms. Heasley failed to acknowledge commendations

and compliments Mr. Boandl received from other IRS supervisors, are evidence of the hostile

work environment to which he was subjected. Id. Mr. Boandl's former co-worker, Adam

Florkowski, described an incident when Ms. Heasley scolded Mr. Boandl loudly, publicly, and

using a demeaning tone for an error in his payroll report. Florkowski Affidavit, Boandl Ex. 9.

Mr. Boandl's hostile work environment claim must be dismissed. First, he has failed to

set forth any evidence that would allow a reasonable trier of fact to conclude that he was harassed

because of his membership in a protected class. In other words, Mr. Boandl has not alleged that

any of the harassment he allegedly suffered was based on his disability, age, or gender. Instead,

almost every example Mr. Boandl provides supporting his hostile work environment claim

concerns an interaction where Ms. Heasley criticized him based solely on his work performance

or reprimanded him for an action he had taken in his capacity as a Revenue Agent.

Moreover, Mr. Boandl has failed to allege or provide evidence of conduct that, when

viewed objectively, would allow a fact-finder to conclude that his working conditions were

altered. Mr. Boandl describes conduct that was rude, undoubtedly insulted him, and caused him

distress. However, even accepting his accusations as true, he has failed to describe the kind of

conduct courts in this Circuit have accepted as stating a claim for hostile work environment. He

claims Ms. Heasley criticized his work and failed to appropriately recognize him for his

achievements. He does not allege physical contact from Ms. Heasley, he does not describe

specific discriminatory statements made by her, and he does not allege conduct that took place

with any great frequency.  Rather, he describes isolated incidents where Ms. Heasley used a

demeaning tone with him or questioned him concerning work-related mistakes or misconduct.

He alleges approximately four incidents that took place over the course of a year and asserts

multiple complaints concerning Ms. Heasley's failure to compliment and voice concern for him

in the manner he wished.  There is no requirement under any relevant law that a supervisor act

with a particular degree of civility.[17]  Because Mr. Boandl has failed to allege conduct which

creates a claim for hostile work environment, I need not examine the remaining elements.[18]

Mr. Boandl has failed to state a hostile work environment claim under the Rehabilitation

Act, the ADEA, or Title VII.  I will dismiss all three hostile work environment claims.

### G.     Constructive Discharge Claim

Courts reviewing constructive discharge claims must employ an objective standard, and

ask whether "the conduct complained of would have the foreseeable result that working

conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes

would resign."  Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993).  The

---

[17]  As noted eloquently by Judge Ditter, "[s]o long as what the law identifies as discrimination is not in involved, there is no requirement that a supervisor be friendly, courteous, or kind. To the contrary, the boss may be demanding, exacting, and unreasonable. He or she may deride, discipline, or demote with or without cause. Again, so long as what is inflicted is not a pretext for discrimination, there is no guarantee that the workplace will be cheerful and pleasant, smiles and compliments, praise and promotion. Bad management techniques are not in and of themselves discrimination.  Lebofsky v. City of Phila., No. 06-5106, 2009 WL 1507581 at *10 n. 21 (E.D.Pa. May 29, 2009) aff'd 2010 WL 3610184 (3d Cir. Sep. 17, 2010).

[18]  Mr. Boandl has set forth allegations sufficient to meet the third prong of the test: he claims that, due to his work environment, he struggled with depression and was unable to enjoy his family life.  He also claims that his doctor prescribed him medication for his symptoms and recommended that he take sick leave from work.  While I recognize that Mr. Boandl was detrimentally affected by his work environment, I believe he has failed to allege conduct that a reasonable employee would view similarly.

leading constructive discharge decision from the Supreme Court, <u>Penn. State Police v. Suders</u>, describes in detail the showing a plaintiff must make when alleging a compound hostile work environment constructive discharge claim. 542 U.S. at 130. In this type of claim, the plaintiff must make an additional showing beyond that required for a simple hostile work environment claim. <u>Id.</u> ("A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign); see also <u>Stremple v. Nicholson</u>, 289 Fed.Appx. 571, 573 (3d Cir. 2008) (non-precedential opinion).

However, a compound claim is only one type of constructive discharge claim. A plaintiff can prove constructive discharge independent of a hostile work environment based on the actions of a supervisor. <u>See</u> <u>Stremple</u>, 289 Fed.Appx. at 573-74 (affirming bench trial decision in favor of a surgeon in which the court rejected the surgeon's hostile work environment claim but found in his favor on a constructive discharge claim where the surgeon showed "a slow degradation of his responsibilities, status, and authority" and was "forced out of his position."). The factors relevant to whether a plaintiff can make this kind of supervisor-based constructive discharge claim, known as the <u>Clowes</u> factors, are "whether the employer (1) threatened [the employee] with discharge or urged or suggested that she resign or retire; (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." <u>Colwell</u>, 602 F.3d at 503.

It is unclear whether Mr. Boandl makes a compound or supervisor-based constructive discharge claim. <u>See</u> Boandl Compl. ¶¶ 28-29 (Boandl . . . was denied promotions and then denied reasonable accommodation, subjected to retaliation and harassment, denied proper evaluations . . . subjected to pretextual evaluations and discipline, subjected to retaliatory

investigations, a hostile work environment, and intolerable working conditions, which led to his

forced termination shown by his unplanned retirement.  The working conditions were such as to

constitute a constructive discharge.").  Because I have found that Mr. Boandl failed to state a

hostile work environment claim, and success on such a claim is predicate to success on a

compound hostile environment constructive discharge claim, I will grant the defendant's motion

for summary judgment insofar as it seeks dismissal of a compound claim.

     Mr. Boandl has presented evidence, however, of actions taken by his supervisors which,

though not supportive of a hostile work environment claim, so degraded his professional life that

a trier of fact could conclude that he was constructively discharged.  As described in great detail

above in connection with Mr. Boandl's retaliation claim, Mr. Boandl was referred to TIGTA for

investigation in February of 2004 for the issuance of a complimentary letter to a taxpayer.  In

March of 2004, he was given a negative job evaluation, placed on a performance improvement

plan that included periodic reviews of his work, and informed that if he did not improve his

performance within 120 days, he faced termination.  He was also removed from the IRS'

Flexiplace program.  He describes his decision to retire as follows:

> I found out that Mr. Briggs was taking action to fire me.  Then, Mr. Briggs
> said that I could exhaust my entire sick leave from July through September,
> if I agreed to submit my retirement papers immediately.  On July 13, 2004,
> I felt forced to submit the requested Memorandum to Mr. Briggs and my
> retirement papers on July 26, 2004.  My intentions were to retire around, or
> after 2006[.]  .  .  .  The situation had become so intolerable that it was
> impossible for me to do my work.  All this constant intimidation and my
> increasing health concerns showed me that I needed to follow my doctor's
> advice.

Boandl Affidavit, 14-15.

Mr. Boandl therefore has alleged facts that meet at least three of the six <u>Clowes</u> factors: he was threatened with discharge and was urged by Mr. Briggs to retire; his benefits were reduced at least in the sense that his participation in the Flexiplace program was taken away, and he was given unsatisfactory job evaluations. I believe there is no evidence these actions were taken because of his age or his gender; however, insofar as this pattern of retaliatory behavior was connected to Mr. Boandl's disability-related request for an accommodation and his EEOC charges, I will allow his constructive discharge claim to proceed under the Rehabilitation Act.

## IV.    CONCLUSION

I will grant the defendant's motion for summary judgment as to the following claims: Mr. Boandl's Title VII claims for failure to promote, hostile work environment, and constructive discharge, his ADEA claims for failure to promote, hostile work environment, and constructive discharge, and his Rehabilitation Act retaliation claims based on the TIGTA referral and the negative enrolled agent application reference. That leaves Mr. Boandl with the following claims: a failure to promote claim under the Rehabilitation Act (which the defendant did not seek to dismiss); a failure to accommodate claim under the Rehabilitation Act; a retaliation claim under the Rehabilitation Act based on the defendant's issuance of a negative performance evaluation and performance improvement plan; and a constructive discharge claim under the Rehabilitation Act.